1

2

3

4

5                 IN THE UNITED STATES DISTRICT COURT

6              FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    DOUGLAS HENDRICKSON,                 Nos.   14-cv-01416 CRB
                                                 14-cv-01417 CRB
9              Plaintiff,
                                          **ORDER GRANTING IN PART AND**
10       v.                               **DENYING IN PART CROSS**
                                          **MOTIONS FOR PARTIAL**
11   OCTAGON INC,                         **SUMMARY JUDGMENT**

12             Defendant.
     _____
13   CLIFFORD LABOY, JR.,

14             Plaintiff,

15       v.

16   OCTAGON INC,

               Defendant.
17   _____ /

18        Somewhere, Jerry Maguire is blushing.  Plaintiffs and Counter-Defendants Doug

19   Hendrickson and Cliff LaBoy, Jr. are professional sports agents who represent NFL players.

20   For some time, both men worked at Defendant and Counter-Claimant Octagon, Inc.

21   ("Octagon"), a sports agency that runs its NFL operations out of California.[1]  Hendrickson

22   and LaBoy both signed employment agreements that gave the firm rights to the fees they

23   earned from clients in exchange for guaranteed salaries.  They also agreed that, whenever

24   they left the firm, Octagon would retain rights to a portion of certain fees.

25        Two years ago, Hendrickson and LaBoy left Octagon to join Counter-Defendant

26   Relativity Sports, LLC ("Relativity").[2]  And they do not want to share.  Hendrickson and

27   _____

28        [1]  Octagon is a Washington, D.C. corporation with headquarters in Virginia.

        [2]  Although Relativity now calls itself Independent Sports and Entertainment, the Court refers
     to the firm as Relativity.  See Darren Heitner, Relativity Sports Gets Rebranded As Independent Sports
     and Entertainment, Forbes.com (June 20, 2016), http://www.forbes.com/sites/darrenheitner/2016

United States District Court
For the Northern District of California

LaBoy filed these suits simultaneously seeking to, among other things, get out of their fee-sharing arrangements with Octagon.  They argue that these provisions unlawfully restrain trade under California law.  Octagon countersued, responding "Show me the money!"

## I.    BACKGROUND

The facts that matter here are not in dispute.[3]  Instead this case presents purely legal questions about how state law applies to the disputed employment agreements – and how it interacts with the peculiar circumstances surrounding NFL teams, players, and agents.

### A.    The World of NFL Agents

Not everyone can represent an NFL player.  The NFL Player's Association ("NFLPA") controls who may be a "certified contract advisor" – legalese for sports agent – and governs what they may and may not do.  Picciotto 1416 (dkt. 89-1) Decl. ¶ 6.[4]  It forbids corporate entities or partnerships from being agents (or acting like them).  NFLPA Regulations § 2(A).  It also sets the maximum fee agents may charge and requires them to be paid to directly to agents.[5]  Picciotto 1416 Decl. ¶ 6; NFLPA Regulations § 4(B).  NFLPA standard representation agreements set the particular fee between agent and player and govern their contractual relationship, somewhat like retainer agreements between lawyers and clients.  Picciotto 1416 Decl. ¶ 6.  Agents conduct contract negotiations, seek out endorsement deals, and prepare rookie clients for the NFL Draft.  Id. ¶ 11.  But even after players sign with an NFL team, agents do not get their full fee up-front.  Instead, they get

---

/06/20/relativity-sports-gets-rebranded-independent-sports-and-entertainment/#66031a171555.

[3]  The parties quibble about whether Hendrickson paid Octagon fees earned from contracts signed by NFL Players Shonn Greene and Whitney Mercilus.  See Hendrickson Opp'n (dkt. 95) at 24; Octagon 1416 Reply (dkt. 96) at 11-12.  But this only goes to the measure of damages, not their existence.  Hendrickson had dozens of clients, not just two.  Picciotto 1416 Decl. ¶ 5.

[4]  Refers to Picciotto declaration filed in Hendrickson (case no. 14-1416).  Citations to his declaration filed in LaBoy (case no. 14-1417) are denoted "Picciotto 1417 Decl."  The Court uses the same number designation to distinguish between other filings in Hendrickson and LaBoy.

[5]  Contrary to representations from counsel, players paid Hendrickson his fees, which he paid to Octagon, and which Octagon – per the terms of his agreement – repaid as salary and bonuses.  Compare Hendrickson Decl. (dkt. 79-1) ¶ 7, with Relativity 1416 (dkt. 94) Opp'n at 2.  LaBoy maintains that his fees were "assigned" to Octagon, though he too acknowledges that NFLPA regulations required that clients pay him directly.  See LaBoy Decl. (dkt. 85-1) ¶ 8.  In any event, none of this changes the outcome here.  See infra Part III.C.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

paid when players get paid, starting with a signing bonus and continuing through the life of the contract. Id. ¶ 6.

Consider Russell Wilson, the former third-round pick who has taken the Seattle Seahawks to two Super Bowls.  In 2015, Wilson signed a four-year contract extension that, after a $31 million signing bonus, will pay the quarterback $12.3 million in 2016, $12.6 million in 2017, $15.5 million in 2018, and $17 million in 2019.  Jason La Canfora, Inside the Numbers: Russell Wilson's Deal Broken Down Year By Year, CBS Sports (August 1, 2015).[6]  So if Wilson's NFLPA standard representation agreement set a three-percent fee, his agent would get $309,000 in 2016, $378,000 in 2017, $465,000 in 2018, and $510,000 in 2019 – on top of the $930,000 paid at signing.  That means Wilson's agent would not earn his full $2,652,000 fee until 2019, over four years after signing.  See also Picciotto 1416 Decl. ¶ 8; Picciotto 1417 Decl. ¶ 8.

And not all players are Russell Wilson.  Some college stars flame-out, others get hurt, and still others retire in their prime.  Time and money often go to waste.  To hedge against these risks, many agents work for a firm that takes the hit on bad investments and guarantees a salary in exchange for a share of the agent's fees.  See Picciotto 1416 Decl.  ¶¶ 10-11.  Employment agreements between agent and firm govern these relationships.

**B.      Hendrickson & Octagon**

Hendrickson joined Octagon's NFL Division as an agent in 2001.  Hendrickson Decl. (dkt. 79-1) ¶ 3.  Although Octagon was incorporated in Washington, DC and has headquarters in Virginia, its NFL Division calls California home.  Id.; Hasse Decl. (dkt. 18) ¶ 2.  While working at Octagon, Hendrickson lived, worked, and voted in California – where he lives, works, and votes today.  Id. ¶ 2.

Hendrickson negotiated his original employment agreement through counsel.  Picciotto 1416 Decl. ¶ 2.  To stay at Octagon, Hendrickson signed a new employment agreement ("Hendrickson Agreement") in 2007, again represented by counsel.  Hendrickson

---

[6] http://www.cbssports.com/nfl/writer/jason-la-canfora/25256608/inside-the-numbers -russell -wilsons-deal-broken-down-year-by-year.

United States District Court
For the Northern District of California

Decl. ¶ 6; Picciotto 1416 Decl. ¶ 2.  This agreement included a salary increase to $500,000 plus bonuses, as well as the provisions at issue here.

After five more years at Octagon, Hendrickson resigned in December 2012 and ultimately left in December 2013 following a one-year notice period.  See Hendrickson Decl. ¶ 8; Hendrickson Agreement (dkt. 38-1) ¶ 2(a).  He sued on February 21, 2014 and joined Relativity five days later.  See Hendrickson Decl. ¶ 8.  Octagon filed several counterclaims against Hendrickson and Relativity, including a counterclaim for declaratory relief on Paragraphs 5(b), 6(a), and 6(b) against Hendrickson.[7]  See Answer to Am. Compl. (dkt. 42) ¶¶ 34-74.  Summary judgment hinges on the following provisions:

### 1.    Paragraph 16

Under Paragraph 16, Hendrickson's agreement "shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, USA without regard to conflicts of laws principles."  Paragraph 16 also requires that the "location for any legal proceedings . . . be Fairfax County, Virginia."  The Court held that the latter forum selection clause was unenforceable but has not expressed an opinion about the former choice-of-law provision.  See Order Mot. to Transfer (dkts. 31 & 30) at 3-5.

### 2.    Paragraphs 6(a) & 6(b)

Paragraphs 6(a) and 6(b) of Hendrickson's agreement create a fee-sharing arrangement for whenever he left Octagon.  Paragraph 6(b) requires Hendrickson to pay fifty percent of any fees from player-team contracts that were "entered into or substantially negotiated" while Hendrickson worked there "but which have not been earned before" he left.  See Hendrickson Agreement ¶ 6(b).[8]

---

[7]  When pleading its counterclaims, Octagon requested only declaratory relief regarding Paragraphs 6(a) and 6(b) but now includes Paragraph 5(b) in its Notice of Motion for Partial Summary Judgment.  Compare Answer (dkt. 42) ¶¶ 35-37, with Not. Mot. (dkt. 79) at 1.  Regardless, the Court must still rule on the latter provision because Hendrickson himself has properly requested declaratory relief.  See Hendrickson Not. Mot. at 1.

[8]  Paragraphs 6(a) and 6(b) also make clear that "100% of extensions, modifications and renewals of non-playing contracts," like endorsements, belong to Octagon (excepting contracts with companies that make football equipment and video games).

United States District Court
For the Northern District of California

1   Paragraph 6(a) requires Hendrickson to pay gradually decreasing percentages of any

2   fees from "new contracts, extensions, modifications, and/or renewals" executed by "clients"

3   within twelve months of Hendrickson's departure.[9]  See Hendrickson Agreement ¶ 6(b).

4   "Clients" means anyone who (i) was an Octagon client "at any time" during the twelve

5   months after Hendrickson left and had been "involved" with him, (ii) was an Octagon client

6   "at any time" in the six months before Hendrickson left, regardless of whether they had

7   contact, or (iii) was a "prospective client[]" that Octagon or Hendrickson "actively solicited .

8   . . at any time" during those six months.  See Hendrickson Agreement ¶ 5(c).

9   ### 3.     Paragraph 5(b)

10   Paragraph 5(b) states the Hendrickson may not "solicit for employment" or "work in

11   any capacity with" Octagon employees and consultants who worked there during the twelve

12   months after Hendrickson left or who themselves left during the six months before

13   Hendrickson's departure.  See Hendrickson Agreement ¶ 6(b).[10]

14   ### C.     LaBoy & Octagon

15   LaBoy joined Octagon's NFL Division as an intern in 2004 and ultimately became an

16   agent.  Picciotto 1417 Decl. ¶ 4.  He worked as an at-will employee until 2008, the year he

17   signed his now-disputed employee agreement ("LaBoy Agreement").  LaBoy Decl. (dkt.

18   85-1) ¶ 7.  This agreement assured his position for two years, followed by at-will

19   employment from then on.  LaBoy Agreement (dkt. 37-1) ¶ 2.  LaBoy maintains that the

20   offer was "take it or leave it."  LaBoy Decl. ¶ 7.  He continued living in California until

21   2009, when he moved to Georgia.  Picciotto 1417 Decl. ¶ 4.  Despite the move, LaBoy

22

23   _____

24   [9]  Hendrickson's agreement calls these twelve months the "Restricted Period."  Hendrickson Agreement ¶ 1.

25   [10]  Paragraph 5 has two other clauses no longer at issue here.  Paragraph 5(a), if enforced, would

26   prevent Hendrickson from ever working at several competing firms.  See Hendrickson Agreement ¶ 5(a).  Paragraph 5(c) would prevent Hendrickson from ever appropriating existing and certain

27   prospective "business opportunities."  It also bars Hendrickson from soliciting Octagon clients for twelve months after leaving the firm.  See Hendrickson Agreement ¶ 5(c).  Octagon has filed a covenant

28   not to enforce either provision.  See 1416 Covenant (dkt. 25-1) ¶¶ D, E, 1.  For this reason, the Court dismissed as moot Hendrickson's claims related to these two provisions.  See Order Mot. to Transfer at 1.

United States District Court
For the Northern District of California

1    estimates that he spent "80%" of his time at Octagon "working in California and/or for

2    California-based players."  LaBoy Decl. ¶ 4.

3         LaBoy quit Octagon and filed suit the same day.[11]  LaBoy Decl. ¶ 9.  He moved back

4    to California and joined Hendrickson at Relativity shortly thereafter.  Id. ¶ 2.  Octagon filed a

5    familiar batch of counterclaims against LaBoy and Relativity, including requests for

6    declaratory relief on Paragraphs 6(c) and 10 against LaBoy.[12]  See Answer to Am. Compl.

7    (dkt. 48) ¶¶ 34-74.  The parties filed cross-motions for partial summary judgment that hinge

8    on the following provisions:[13]

9              **1.    Paragraph 16**

10        LaBoy's agreement contains an identical choice-of-law provision to Hendrickson's.

11   See LaBoy Agreement ¶ 16.  It also contains an identical – and identically unenforceable –

12   forum selection clause.  Id.

13             **2.    Paragraph 2**

14        Paragraph 2 sets a two-year term of employment from April 1, 2008 to March 31,

15   2010, during which LaBoy could only be fired for-cause.  LaBoy Agreement ¶ 2(a)-(b).

16   Those two years comprise the "Term Employment Period."  Id. ¶ 2(a).  After the "Term

17   Employment Period," LaBoy "shall continue" working as an at-will employee for an

18   indefinite period.  Id. ¶ 2(a).  Paragraph 2 also makes clear that the term "Employment

19   Period" refers to the "entire" period during which LaBoy worked at Octagon.  Id.  Finally,

20   the two years after LaBoy's departure make up his "Restricted Period."

21

22        [11]  LaBoy and Hendrickson both filed suit on February 21, 2014.

23        [12]  Octagon's Notice of Motion for Partial Summary Judgment also includes, strangely, a request
24   for declaratory relief regarding Paragraph 5, a non-compete clause purporting to bar LaBoy from
     working at several specified firms.  Compare Answer to Am. Compl. (dkt. 48) ¶¶ 35-37, with Not. Mot.
     (dkt. 94) at 1.  Given Octagon's Covenant not to sue based on Paragraph 5, this could be an oversight.
25   See 1417 Covenant (dkt. 24-2) at 2.

26        [13]  Although Paragraph 7 of LaBoy's agreement resembles the non-solicitation clause in
     Paragraph 5(b) of Hendrickson's agreement, LaBoy does not challenge it, probably because it is
27   narrower.  Compare LaBoy Agreement ¶ 7 ("Employee will not . . . raid[] any of the Company's
     employees or solicit[] any of them to resign . . .), with Hendrickson Agreement ¶ 5(b) (Employee will
28   not "solicit for employment or go to work in any capacity with" current or recently departed Octagon
     employees).

### 3.      Paragraphs 6(c) & 10

Paragraphs 6(c) and 10 create a fee-sharing arrangement for whenever LaBoy left Octagon.  Paragraph 10 requires LaBoy to "return" all "Company Property" to Octagon upon his departure, which – under Paragraph 6(a)(1) – includes any "Company Client Contract," "Company Business Opportunity," or fees and compensation derived from either "regardless" of whether LaBoy receives the money during the Employment Period, the Restricted period, or thereafter."  See LaBoy Agreement ¶¶ 6(a)(1)(d)-(g).

"Company Client Contract" means any (i) any contract, agreement, etc "entered into or being negotiated" while LaBoy worked at Octagon, (ii) any renewal, extension, etc "entered into or being negotiated" while LaBoy worked at Octagon, (iii) any contract, agreement, etc "entered into" within a year of LaBoy's departure, and (iv) any contract, agreement, etc that would have fallen under the other three provisions "but for an intentional effort" to avoid them.  See LaBoy Agreement ¶ 6(a)(3).  "Company Client" means any player with whom LaBoy had contact at Octagon and who was an Octagon client during the two years before LaBoy's departure.  See LaBoy Agreement ¶ 6(a)(2).  "Company Business Opportunity" means any "business opportunity or prospective business opportunity" that Octagon or LaBoy "actively targeted or solicited" during LaBoy's final year at Octagon.  See LaBoy Agreement ¶ 6(a)(4).

In the event that LaBoy "breaches" Paragraph 6 "or is permitted by [Octagon] or otherwise" to "solicit or represent" a Company Business Opportunity or Company Client within two years of leaving Octagon, Paragraph 6(c) governs how Octagon and LaBoy will share Company Property (if at all).[14]  See LaBoy Agreement ¶ 6(c).  Under Paragraphs 6(c)(2) and 6(c)(2)(a), Octagon owns any fees deriving from a player-team contract "entered into or being negotiated" while LaBoy was the "agent of record" while at Octagon.  Octagon gets to keep these fees.  See LaBoy Agreement ¶ 6(a), 6(c)(2).

---

[14]   Paragraph 6(b), if enforced, would prevent LaBoy from soliciting or appropriating Company Business Opportunities and Company Clients during his first two years away from Octagon.  Octagon has covenanted not to enforce this provision.  See 1417 Covenant at 2.

7

1    Under Paragraphs 6(c)(2)(b) and 6(c)(2)(c), Octagon also owns any fees deriving

2   from a player-team contract "entered into or being negotiated" during LaBoy's first two

3   years away from Octagon for which he was the "agent of record."  Octagon must share these

4   fees.  See LaBoy Agreement ¶¶ 6(c)(2)(b)(1)-(4); 6(c)(2)(c)(1)-(3).

5           **D.      Claims and Counterclaims At Issue**

6           Hendrickson, LaBoy, and Octagon – but not Relativity – have moved for partial

7   summary judgment on an array of claims and counterclaims.  For his part, Hendrickson has

8   moved for partial summary judgment on:

9   •    His second claim for declaratory and injunctive relief because Paragraphs 5(b) and 6
10        of his agreement allegedly violate California Business and Professions Code Section
          16600.  See Cal. Code Civ. Proc. § 1060.

11  •    His sixth claim for Unfair Business Practices because the agreement contained
          allegedly unlawful provisions.  See Cal. Business & Prof. Code § 17200.
12
13  •    His first claim for Restraint on Trade because the agreement contained allegedly
          unlawful provisions.  See Cal. Business & Prof. Code § 16600.

14  •    Octagon's first counterclaim for declaratory and injunctive relief regarding
          Paragraphs 5(b) and 6 of his agreement.
15
16  •    Octagon's second counterclaim for breach of contract to the extent it relies on
          Paragraphs 5(b) and 6 of his agreement.

17  •    Octagon's third counterclaim for intentional interference with a contract to the
          extent it relies on Paragraphs 5(b) and 6 of his agreement.
18
19  •    Octagon's fourth counterclaim for interference with prospective economic
          advantage to the extent it relies on Paragraphs 5(b) and 6 of his agreement.

20  •    Octagon's fifth counterclaim for conversion to the extent it relies on Paragraphs 5(b)
          and 6 of his agreement.
21
22  •    Octagon's sixth counterclaim for money had and received to the extent it relies on
          Paragraphs 5(b) and 6 of his agreement.

23  •    Octagon's seventh counterclaim for Unfair Competition to the extent it relies on
          Paragraphs 5(b) and 6 of his agreement.  See Cal. Business & Prof. Code § 17200.
24
     LaBoy has moved for partial summary judgment on:
25
26  •    His second claim for declaratory and injunctive relief because Paragraphs 6(c) and
          10 of his agreement allegedly violate California Business and Professions Code
          Section 16600, see Cal. Code Civ. Proc. § 1060, as well as because his agreement
27        allegedly expired or, in the alternative, because his obligations were never triggered.

28  •    His seventh claim for Unfair Business Practices because the agreement contained
          allegedly unlawful provisions.  See Cal. Business & Prof. Code § 17200.

United States District Court
For the Northern District of California

1

2
- His first claim for Restraint on Trade because the agreement contained allegedly unlawful provisions. <u>See</u> Cal. Business & Prof. Code § 16600.

3
- Octagon's first counterclaim for declaratory and injunctive relief regarding Paragraphs 6(c) and 10 of his agreement.

4

5
- Octagon's second counterclaim for breach of contract to the extent it relies on Paragraphs 5, 6, and 10 of his agreement.

6
- Octagon's third counterclaim for intentional interference with a contract to the extent it relies on Paragraphs 5, 6, and 10 of his agreement.

7

8
- Octagon's fourth counterclaim for interference with prospective economic advantage to the extent it relies on Paragraphs 5, 6, and 10 of his agreement.

9
- Octagon's fifth counterclaim for conversion to the extent it relies on Paragraphs 5, 6, and 10 of his agreement.

10

11
- Octagon's sixth counterclaim for money had and received to the extent it relies on Paragraphs 5, 6, and 10 of his agreement.

12
- Octagon's seventh counterclaim for Unfair Competition to the extent it relies on Paragraphs 5, 6, and 10 of his agreement. <u>See</u> Cal. Business & Prof. Code § 17200.

13

14
Octagon has moved for partial summary judgment on:

15
- Its first claims for declaratory and injunctive relief against Hendrickson regarding Paragraphs 5(b) and 6 of his agreement, as well as against LaBoy regarding Paragraphs 5,[15] 6(c), and 10 of his agreement.

16

17
- Its second claims for breach of contract against Hendrickson and LaBoy.

18
- Its third claims for intentional interference with a contract against Hendrickson, LaBoy, and Relativity.

19
- Its fourth claims for intentional interference with prospective economic advantage against Hendrickson, LaBoy, and Relativity.

20

21
## II.   LEGAL STANDARD

22
Partial summary judgment allows for the prompt disposition of specific claims or

23
defenses.  The Court can grant a motion for partial summary judgment "if the movant

24
shows that there is no genuine dispute as to any material fact and the movant is entitled to

25
judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  A principal purpose of partial

26
summary judgment "is to isolate and dispose of factually unsupported claims."  <u>Celotex</u>

27
<u>Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  A dispute is genuine if the admissible

28

_____

[15] <u>See</u> <u>supra</u> note 12.

United States District Court
For the Northern District of California

1   evidence on the record "is such that a reasonable jury could return a verdict" for either

2   party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is material if it

3   could affect the outcome of the suit under the governing law.  <u>Id.</u> at 248-49 (quoting <u>First</u>

4   <u>Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288 (1968)).  To determine whether a

5   genuine dispute as to any material fact exists, the Court must view the evidence in the light

6   most favorable to the non-moving party.  <u>Id.</u> at 255.

7   **III.    DISCUSSION**

8          Because the material facts here are not in dispute, the Court need only resolve a

9   dispute about what two contracts say and how the law treats what they say.[16]

10         **A.     Threshold Issues**

11         The parties first dispute whether California or Virginia law applies.  <u>See, e.g.</u>,

12  Hendrickson Mot. at 6-12; LaBoy Mot. at 8-13; Octagon 1417 Opp'n 12-13.  LaBoy also

13  argues that the Court may not enforce his fee-sharing arrangements because his agreement

14  expired and, in the alternative, because those arrangements have not been triggered.

15         **1.     Choice of Law**

16         Although both agreements at issue here would have the Court apply Virginia law,

17  even an express choice-of-law provision does not trump California choice-of-law rules.

18  <u>See</u> <u>Hatfield v. Halifax PLC</u>, 564 F.3d 1177, 1182 (9th Cir. 2009); Hendrickson Agreement

19  ¶ 16; LaBoy Agreement ¶ 16.  California follows the Second Restatement of Conflict of

20  Laws, which enforces choice-of-law provisions unless either (1) "the chosen state has no

21  substantial relationship to the parties or the transaction and there is no other reasonable

22  basis for the parties' choice" or (2) applying the chosen state's law "would be contrary to a

23  fundamental policy of a state" with "a materially greater interest" in determining the legal

24  question, so long as the latter state's law would apply "in the absence of an effective choice

25  of law by the parties."   Restatement (Second) of Conflict of Laws § 187.  Because Octagon

26  has its headquarters in Virginia, it has a "substantial relationship" with the state.  <u>See</u>

27

28         [16]  This case presents an "actual controversy" about rights under a contract, so the Court may
    issue a declaratory judgment.  <u>See</u> <u>Am. States Ins. Co. v. Kearns</u>, 15 F.3d 142, 143-144 (9th Cir. 1994);
    28 U.S.C. § 220; Cal. Code Civ. Proc. § 1060.

United States District Court
For the Northern District of California

1    _Hughes Electronics Corp. v. Citibank Delaware_, 120 Cal. App. 4th 251, 258 (2004).  The

2    first Restatement test is not met.

3         The second presents a closer question, but not by much.  California's "settled

4    legislative policy" prohibits any restraint on trade, however reasonable.  _Edwards v. Arthur_

5    _Andersen LLP_, 44 Cal. 4th 937, 950 (2008).  By contrast, Virginia applies the "rule of

6    reasonableness" and allows restraints if they protect a legitimate business interest, are not

7    unduly burdensome, and are not otherwise against public policy.  _See_ _Omniplex World_

8    _Servs. Corp. v. U.S. Investigations Servs., Inc._, 618 S.E.2d 340, 342 (Va. 2005).  Virginia

9    law is thus contrary to California public policy.

10        California also has a materially greater interest in both disputes.  Octagon bases its

11   NFL Division in California.  Hasse Decl. ¶ 2.  While at Octagon, Hendrickson lived and

12   worked in California.  Hendrickson Decl. ¶¶ 2-3.  LaBoy lived and worked in both

13   California and Georgia.  LaBoy Decl. ¶¶ 2, 4.  Both agents live and work in California

14   today.  Hendrickson Decl. ¶¶ 2-3; LaBoy Decl. ¶ 2.  Virginia appears to have no connection

15   to this dispute other than housing Octagon's headquarters.  _See_ Hasse Decl. ¶ 2.  This case

16   therefore involves a dispute between (primarily) California employees, their current

17   California employer, and their former California employer.

18        Finally, California law would apply to both agreements absent a choice of law

19   provision.  California courts look to "(a) the place of contracting, (b) the place of

20   negotiation of the contract, (c) the place of performance, (d) the location of the subject

21   matter of the contract, and (e) the domicil, residence, nationality, place of incorporations

22   and place of business of the parties."   Restatement (Second) of Conflict of Laws § 188.

23   Here, the parties signed and (it appears) negotiated the agreements in California.  They

24   performed (and allegedly breached) their contractual obligations mainly in California.  And

25   they are now fighting over fees in California.  California law controls.

26                    **2.      Alleged Expiration of LaBoy's Agreement**

27        LaBoy argues that the fee-sharing arrangements set forth in Paragraphs 6(c) and 10

28   of his agreement were "inapplicable at the time" he resigned and "cannot be applied to

United States District Court
For the Northern District of California

1   him" because his agreement has "expired."  LaBoy Mot. at 22; LaBoy Opp'n at 13.  He

2   also stresses that, after his term-employment period ended in March 2010, he continued

3   working at Octagon as an at-will employee.  True enough.  But Paragraph 6(c) makes clear

4   that the agreement controls during LaBoy's "Employment Period" as well as his

5   "Restricted Period."  See LaBoy Agreement ¶ 6(c).  And under Paragraph 2(a), those cover

6   both the "entire period" LaBoy worked at Octagon as well as the two years afterwards, not

7   just the period from April 2008 through March 2010.  See LaBoy Agreement ¶¶ 2(a), 6(c).

8   LaBoy's argument to the contrary has no merit.

9                       **3.      Triggering Provision in LaBoy's Agreement**

10           LaBoy also argues that the Court cannot enforce his agreement's fee-sharing

11   arrangements because they have not been triggered.  See LaBoy Mot. at 20.  Under

12   Paragraph 6(c), fee-sharing kicks in when LaBoy "breaches" Paragraph 6 "or is permitted

13   by [Octagon] or otherwise to solicit or represent" Octagon business opportunities and

14   clients.  LaBoy maintains that, because he only "breached" the unlawful non-solicitation

15   provision in Paragraph 6(b), "a wholly void condition precedent exists" for the fee-sharing

16   arrangements.  See LaBoy Reply at 11.  He also argues that Octagon has not "permitted"

17   him to represent these clients because "Octagon is actively suing LaBoy."  Id. at 12.

18           No.  Octagon has promised – in writing – not to enforce Paragraph 6(b).  That is

19   permission.  The Court will not distinguish between "Mr. LaBoy, you are no longer

20   forbidden from soliciting and representing our business opportunities and clients" and "Mr.

21   LaBoy, you are permitted to solicit and represent our business opportunities and clients."

22   What is more, Octagon is not "actively suing" LaBoy to prevent him from representing

23   certain clients; it is seeking fees he agreed to share.  That may or may not restrain trade

24   under California law, but Paragraph 6 poses no obstacle to reaching that question.

25           **B.      Fee-Sharing Arrangements Under Section 16600**

26           Under their employee agreements, both Hendrickson and LaBoy must pay Octagon

27   portions of the fees they earn from player-team contracts even after leaving the firm.  See

28   Hendrickson Agreement ¶¶ 6(a)-(b); LaBoy Agreement ¶¶ 6(c)(2)(a)-(c).  The agreements

United States District Court
For the Northern District of California

use somewhat different mechanisms to do the same two things.  First, the agreements require Hendrickson and LaBoy to share fees from player contracts signed or negotiated while they worked at Octagon.  See Hendrickson Agreement ¶ 6(b); LaBoy Agreement ¶¶ 6(c)(2)(a).  Hendrickson keeps half of these fees but LaBoy keeps none.  See id.  Second, the agreements require Hendrickson and LaBoy to share fees from contracts signed or, in LaBoy's case, negotiated during the "Restricted Period."  See Hendrickson Agreement ¶ 6(a); LaBoy Agreement ¶¶ 6(c)(2)(b)-(c).  Hendrickson's "Restricted Period" lasts one year after his departure.  Hendrickson Agreement ¶ 1(a).  LaBoy's lasts two.  LaBoy Agreement ¶ 2(a).  Both agents take home higher and higher percentages of these fees over time.  See Hendrickson Agreement ¶ 6(a); LaBoy Agreement ¶¶ 6(c)(2)(b)-(c).  Hendrickson and LaBoy – along with their new firm – insist that these fee sharing arrangements violate California Business and Professions Code Section 16600, which voids provisions in "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind."[17]

Section 16600 "evinces a settled legislative policy" that favors "open competition and employee mobility."  Edwards v. Arthur Andersen LLP, 44 Cal. 4th 937, 945 (2008).  For this reason, California courts take no prisoners when it comes to Section 16600.[18]  An accounting firm, for example, may not bar a departing employee from providing accounting services for her clients, nor may it bar her from soliciting the firm's clients.[19]  See Edwards, 44 Cal. 4th. at 285, 290.  Companies also may not require departing employees to forfeit post-employment benefits if they join a competitor.  See Ware v. Merrill Lynch, 24 Cal.

---

[17] Ironically, both Hendrickson and LaBoy signed employment agreements with Relativity that contain fee-sharing arrangements.  See Hendrickson Relativity Agreement (dkt. 76-1) ¶ 5(e); LaBoy Relativity Agreement (dkt. 82-1) ¶ 5(e).

[18] Octagon maintains that "California courts are unwilling to interfere in the private contractual agreements between sophisticated parties" that are the product of "arms-length negotiations."  Octagon 1416 Opp'n at 9.  The Court rejects the argument, which relies on cases decided decades before Edwards that are no longer good law.  See, e.g., Webb v. West Side Dist. Hosp., 144 Cal. App. 3d 946 (1983) (agreement between physician and hospital).

[19] California law makes exceptions for partners leaving a partnership, like a law firm, and employees leaving an LLC, like Relativity.  See Calif. Business & Prof. Code §§ 16602-16602.5.  The Court therefore does not rest its analysis on an analogy between sports agents and lawyers.

App. 3d. 35, 42-43 (1972) (benefits from profit-sharing plan); <u>Muggill v. Reuben H. Donnelley Corp.</u>, 62 Cal. 2d 239, 242-43 (1965) (pension benefits); <u>Beneficial Life Insurance Company v. Knobelauch</u>, 653 F.2d 393, 395-96 (9th Cir. 1981) (benefits from commission advances).  They also cannot force former employees to pay liquidated damages for competing.  <u>See Morris v. Harris</u>, 127 Cal. App. 2d 476, 477-78 (1954) ($20 penalty per month); <u>Gordon Termite Control v. Terrones</u>, 84 Cal. App. 3d 176, 178-180 (1978) ($50 penalty per client).  Likewise, they may not force a former employee to hand over an invention created on her own time and dime.  <u>See Applied Materials, Inc. v. Adv. Micro-Fabrication Equip. Co.</u>, 630 F. Supp. 2d 1084, 1088-91 (N.D. Cal. 2009).

But Section 16600 does not bar all post-employment obligations; they must still "restrain" trade in the first place.  <u>See USS-POSCO Indus. v. Case</u>, 244 Cal. App. 4th 197, 208-10 (2016).  So although a company may not impose a penalty for joining a competitor, it may still recoup the cost of training a former employee if the employee leaves within a specified period of time.  <u>See id.</u>; <u>City of Oakland v. Hassey</u>, 163 Cal. App. 4th 1477, 1491 (2008).  Because arrangements like this concern "fronted costs" with "readily transportable" benefits for the employee, there is no restraint on trade under Section 16600.  <u>USS-POSCO</u>, 244 Cal. App. 4th at 210.

## 1.    Contracts Signed or Negotiated While At Octagon

Under the agreements, Octagon receives half of Hendrickson's fees from contracts "entered into or substantially negotiated" while he worked there – and all of LaBoy's.  <u>See</u> Hendrickson Agreement ¶ 6(b); LaBoy Agreement ¶¶ 6(c)(2)(a).  But because those fees were owed the moment their clients signed with an NFL team, that is just fine.

If teams paid players a lump-sum salary at signing, Hendrickson, LaBoy, and Octagon would get their money then and there.  And if the agents quit Octagon afterwards, they could not turn around and demand money back.  But that is essentially what they

14

demand here.  In the real world, players get paid in installments, not lump sums.[20]  See Picciotto 1416 Decl. ¶ 7.  The same goes for agents.  Id.  So even though the work is done and the money owed at signing, neither the agent's pockets nor the firm's coffers get filled until years later.  Id.  Voiding Paragraphs 6(b) and 6(c)(2)(a) of their respective agreements would thus let Hendrickson and LaBoy take Octagon's cash simply because they quit before the cash came in.[21]  That makes no sense.  Section 16600 evinces a policy in favor of mobility – not rent-seeking.  Paragraph 6(b) of Hendrickson's agreement and Paragraph 6(c)(2)(a) of LaBoy's are enforceable.

## 2.    Contracts Signed or Negotiated After Leaving Octagon

The fee-sharing arrangements also require Hendrickson and LaBoy to fork over portions off fees they earn from client contracts signed during their "Restricted Periods."[22] Hendrickson Agreement ¶ 6(a); LaBoy Agreement ¶¶ 6(c)(2)(b)-(c).  So unlike those covering contracts signed (or all-but-signed) while Hendrickson and LaBoy were at Octagon, these fee-sharing arrangements cover contracts negotiated and signed after they left.  Still, these are not patent violations Section 16600.  The reality is more complicated.

Consider again Russell Wilson.  Coming out of college, Wilson was a "big-time question mark" at quarterback.  Russell Wilson NFL Draft Profile, NFL.com (2012).[23] Although he was a standout at Wisconsin, scouts doubted that Wilson could make the leap to the NFL because of his height.  Id.  To NFL teams (and thus NFL agents) he was a high risk investment.  And so on draft day, the future Pro-Bowler fell.  The Seattle Seahawks finally selected Wilson in the third round to compete for a roster spot.  Players like Brandon

---

[20]  So, here at least, Octagon undersells its case by analogizing NFL agents to lawyers.  See e.g., Octagon 1416 Mot. at 3.  Most lawyers charge by the hour and bring in revenue as the work gets done. Agents bring in revenue years after their work is done – whether working elsewhere or lying on a beach.

[21]  The same is true for contracts Hendrickson and LaBoy negotiated at Octagon but signed afterwards.  Otherwise agents could spend company time and resources negotiating a major deal, jump ship with signing imminent, and keep everything.

[22]  For Hendrickson, this provision extends only to contracts "executed" within one year of his departure. Hendrickson Agreement ¶ 6(a).  For LaBoy, it also covers contracts "negotiated" within two years of his departure.  LaBoy Agreement ¶ 6(b).  But, as above, that makes no difference.

[23]  http://www.nfl.com/ combine/profiles/russell-wilson?id=2532975.

Taylor, DeVier Posey, and Ryan Broyles all went ahead of him.  Like Wilson, they all signed contracts with NFL teams.  Unlike Wilson, none are on an NFL roster today.[24]

In line with NFLPA requirements, the Seahawks signed Wilson to a four-year rookie contract in the spring of 2012 that paid him an average of $749,176 per year, which would pay an agent earning a 3% fee an average of $22,475 per year.  See Russell Wilson Contract Details, Spotrac.com (2016).[25]  The Denver Broncos paid Peyton Manning an average of $15,750,000 per year over the same span, which would pay an agent earning the same fee an average of $475,500 per year.  See Peyton Manning Contract Details, Spotrac.com (2016).[26]  But less than two years after Wilson signed his rookie deal, the Seahawks trounced the Broncos in Super Bowl XLVIII by a score of 43-8.  So by then anyone who knew anything knew Wilson was in for a huge payday.  If the Seahawks didn't extend him before the end of the 2015 season – and if he avoided a catastrophic injury[27] – another team was sure to offer him a massive new deal when he hit free agency.

Players like Wilson are why firms like Octagon (and Relativity) need fee-sharing arrangements that cover contracts signed even after agents have left.  Without them, agents taking after Oliver Wendell Holmes's proverbial "bad man" could hit the jackpot simply by quitting at the right time.  Cf. Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 459 (1897) ("A man who cares nothing for an ethical rule which is believed and practised by his neighbors is likely nevertheless to care a good deal to avoid being made to pay money . . . .").  But firms can only front costs and guarantee six-figure salaries because they expect lucrative future returns from at least a few of their agents' many clients.  So here too fee-sharing is a hedge against rent-seeking, not a restraint on trade.

---

[24]  Draft and roster information obtained via NFL.com.

[25]  http://www.spotrac.com/nfl/seattle-seahawks/russell-wilson-9885/.

[26]  http://www.spotrac.com/nfl/denver-broncos/peyton-manning-5028/cash-earnings/.

[27]  Players in line for new contracts often take out insurance against this risk.  See, e.g., John Breech, Report: Russell Wilson Takes Out Insurance Policy Worth "Millions," CBS Sports (June 16, 2015), http://www.cbssports.com/nfl/eye-on-football/25216517/report-russell-wilson-takes-out-insurance-policy-worth-millions.  It would surprise the Court if agents and firms play no role in that decision and/or get no cut of any insurance payouts.

Octagon has not "plainly designed" these provisions to "prevent" Hendrickson and LaBoy from leaving Octagon – and Octagon has never admitted "as much." E.g., Hendrickson Mot. at 2. As Octagon has consistently represented, the fee-sharing arrangements protect against "the potential that Hendrickson or LaBoy might suddenly quit and take all of their clients with them." 1416 Mot. to Disqualify (dkt. 67) at 3. Far from being nefarious, these arrangements prevent the agents from snookering Octagon out of the returns on its most lucrative investments. They exist because firms like Octagon (and Relativity) expect agents to move around. They are nothing like the liquidated damages provisions in Morris, 84 Cal. App. 3d at 178-180, or Gordon Termite, 127 Cal. App. 2d at 477-78. Agents are free to go and incur no penalty for doing so. Thus, as long as the fee-sharing arrangements do not extend beyond protecting returns from bona fide firm investments, they pass muster under Section 16600.

### 3.     Reach of Fee-Sharing Arrangements

To the extent Paragraphs 6(a) and 6(b) of Hendrickson's agreement and Paragraph 6(c)(2)(b)-(c) of LaBoy's cover clients that they personally represented at Octagon, those provisions pose no problem under Section 16600.[28] Players may only sign NFLPA standard representation agreements with flesh-and-blood agents, not firms. That means players follow agents until they choose not to. So without fee-sharing arrangements, agents could earn a guaranteed salary – while the firm bears the risk – and then capture all of the returns from successful clients by quitting at the right time. They could even hedge against players deciding to stay with someone else at their old firm by renegotiating for a lower fee. Green-lighting such behavior would doom firms like Octagon. And it may, quite karmically, force agents into the Wild West of solo practitionership.[29]

The more difficult question is whether fee-sharing arrangements may cover fees from players who Hendrickson and LaBoy did not themselves represent while at Octagon.

---

[28] Indeed, Paragraph 6(b) of Hendrickson's agreement reaches no further, since it only covers fees he earned while at Octagon.

[29] Guaranteed salaries not included.

United States District Court
For the Northern District of California

Paragraph 6(a) of Hendrickson's agreement covers not just (i) Octagon clients "with whom [Hendrickson] was involved" but also (ii) any player who was an Octagon client during the six months before Hendrickson left, as well as (iii) "prospective clients" that Hendrickson or Octagon actively solicited during that time.  See Hendrickson Agreement ¶¶ 6(a), 5(c).  Paragraph 6(c)(2)(b)-(c) of LaBoy's agreement covers contracts for which LaBoy was the "agent of record" not just while he was at Octagon but also after he left.

Ultimately, these provisions do not pass muster under Section 16600 insofar as they extend beyond clients Hendrickson and LaBoy personally represented while at Octagon.  Agents cannot cut and run with clients they do not have.  In a world without fee sharing, Russell Wilson's agent could indeed strike gold by quitting before the quarterback signed his mega-deal.  But another agent at his firm could not.  He would have to quit and hope Wilson fired his current agent to hire him instead.  In other words, he would have to compete – successfully to boot.  Octagon may not impinge on Hendrickson's and LaBoy's freedom to do the same.[30]  Accordingly, Paragraphs 6(a) and 6(b) of Hendrickson's agreement and Paragraph 6(c)(2)(b)-(c) of LaBoy's are enforceable – but only to the extent they apply to fees from players that the agents themselves represented while at Octagon.

The agents argue that the Court may not enforce some provisions of the agreements and not others because Applied Materials v. Adv. Micro-Fabrication Equip. Co., 630 F. Supp. 2d 1084 (2009), and Kolani v. Gluska, 64 Cal. App. 4th 402 (1998), refused purportedly similar invitations.  See Hendrickson Reply at 11; LaBoy Reply at 12.  But both agreements at issue here expressly state that, if "any provision or part" of them is "declared void and unenforceable in whole or in part," "the remaining terms shall continue in full force and effect."  Hendrickson Agreement ¶ 13; LaBoy Agreement ¶ 12.  By contrast, the agreement in Applied Materials had such no savings clause.  See 630 F. Supp. 2d at 1090-91.  And though the agreement in Kolani had a savings clause that applied if its express non-compete provision were "unfair" or "unreasonable," it said nothing about if

---

[30] To whatever extent Hendrickson and LaBoy could offer a lower fee as a lure, the same is true of agents that Octagon never employed.

United States District Court
For the Northern District of California

1   that provision were void altogether.  See 64 Cal. App. 4th at 408.  So unlike in Applied

2   Materials or Kolani, the parties here contracted for this very circumstance.  The Court need

3   not eviscerate those efforts.  See Keene v. Harding, 61 Cal. 2d 318, 323-24 (1964).

4        **C.    Fee-Sharing Under California Labor Code Sections 206.5, 221, and 300**

5            Hendrickson and LaBoy also argue that the fee-sharing arrangements require them

6   to forfeit wages in violation of California Labor Code sections 206.5, 221, and 300.  See

7   Hendrickson Mot. at 9; LaBoy Mot. at 10.  They are almost certainly wrong.  Section 206.5

8   prohibits employers from requiring hourly employees to sign a "release" before they have

9   paid the employees their wages.  Section 221 makes it unlawful "for any employer to

10  collect or receive from an employee any part of wages theretofore paid by said employer to

11  said employee."  See Calif. Labor Code § 221 (emphasis added).

12           Section 300 governs the assignment of wages.  So, as an initial matter, there can be

13  no Section 300 problem if no "assignment" of "wages" occurred within the meaning of the

14  statute.  And even assuming the reverse, the agents forget that they would have "assigned"

15  fees to Octagon years before they "assigned" those fees to Relativity.  See Hendrickson

16  Mot. at 9; LaBoy Mot. at 10.  If anything violates Section 300, it is assigning

17  already-assigned fees to Relativity.  See Calif. Labor Code § 300(b)(7).

18       **D.    Non-Solicitation Provision in Hendrickson's Agreement**

19           Although employers may not prohibit former employees from hiring their current

20  employees, California courts allow them to prohibit active solicitation of their current

21  employees.  See, e.g., Arthur J. Gallagher & Co. v. Lang, 2014 WL 2195062 at *4  (N.D.

22  Cal. May 23, 2014); Thomas Weisel Partners LLC v. BNP Paribas, 2010 WL 546497, at *5

23  (N.D. Cal. Feb. 10, 2010).  Such anti-employee raiding provisions accordingly pose no

24  problem under Section 16600.  Id.

25           Paragraph 5(b) of Hendrickson's agreement sweeps too far.  During the two years

26  after his departure, Hendrickson may not "solicit for employment or go to work in any

27  capacity with or for" Octagon employees and consultants – as well as former Octagon

28  employees and consultants who left in the six months before Hendrickson did.  See

United States District Court
For the Northern District of California

Hendrickson Agreement ¶ 5(b) (emphasis added).  Although Octagon maintains that this provision only prevents Hendrickson from "raiding" its employees and that doing so was its "sole intent" all along, Octagon 1416 Mot. at 11, the contract language is not so narrow.  It limits the people with whom he may work even if serendipity alone brings them together.

That is a problem.  Cf. Golden v. Cal. Emergency Physicians Med. Grp., 782 F.3d 1083, 1085, 1092-93 (9th Cir. 2015) (questioning validity of provision barring doctor from working at "any facility" his former employer "may own or with which it may contract in the future").  But since, as above, the parties have expressly contracted for this problem, Paragraph 5(b) may be enforced to its maximum lawful extent rather than torched altogether.[31]  See Hendrickson Agreement ¶ 13; See Keene, 61 Cal. 2d at 323-24.

### E.      Intentional Interference Counterclaims

Octagon has brought counterclaims for intentional interference with a contract and intentional interference with prospective economic advantage against Hendrickson, LaBoy, and Relativity.  Octagon and the agents – but not Relativity – have moved for partial summary judgment on these counterclaims.  To prevail on the former, Octagon must prove "(1) the existence of a valid contract between [Octagon] and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage," Reeves v. Hanlon, 33 Cal. 4th 1140, 1148 (2004).  To prevail on the latter, it must prove those five elements and show that the "interference was wrongful by some measure beyond the fact of the interference itself," Della Penna v. Toyota Motor Sales USA Inc., 11 Cal. 4th 276, 395 (1995).

Neither tort lies against a party to the contract, Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 514 (1994), so Octagon has no tort cause of action against Hendrickson or LaBoy.  See Applied Equip., 7 Cal. 4th at 514.

---

[31]   So enforced, Paragraph 5(b) falls in line with Paragraph 7 of LaBoy's agreement, the anti-employee raiding clause that LaBoy does not challenge.  See LaBoy Not. Mot. at 1-2.

United States District Court
For the Northern District of California

Octagon's counterclaims against Relativity do not share this problem.  And though Relativity argues that there is no evidence that it "engaged in an intentional act other than allegedly not paying fees," Relativity 1416 Opp'n at 5; Relativity 1417 Opp'n at 4, a reasonable jury could conclude otherwise.  Hendrickson and LaBoy filed suit on the same day through the same counsel, while Relativity appears to be driving the whole operation.  See Hendrickson Relativity Agreement ¶ 4(h); LaBoy Relativity Agreement ¶ 4(h) ("Assumption of Liabilities Relating To Employee's Prior Employment, Provision of Legal Representation to Employee, and Indemnification of Employee").  Octagon's counterclaims against Relativity for intentional interference with a contract may move forward.

Octagon's counterclaim for intentional interference with prospective economic advantage, however, may not.  Octagon points to two potential bases for an independent "wrongful act": (1) that Relativity has absconded with Octagon's money and refused to place money in escrow pending the outcome here, "which can be likened to theft," and (2) that Relativity has violated an established "standard of trade."  Octagon 1416 Reply at 12; Octagon 1417 Reply at 13.  The former rationale proves too much, as it would turn most any breach of contract into "theft."  The latter fails too because, for violating a standard of trade to count, the violation must come with "a sanction or means of enforcement" in the industry.  Stevenson Real Estate Serv., Inc. v. CB Richard Ellis Real Estate Serv., Inc., 138 Cal. App. 1215, 1223-24 (2006).  Nothing here suggests that is so.

### F.    Conversion Counterclaims

"California cases permitting an action for conversion of money typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others."  PCO, Inc. v. Christensen, 150 Cal. App. 4th 384, 396 (2007).  For example, a conversion claim lies against someone who accepts funds to be paid to another but pockets the money instead.  Id. at 395.  Money will "only be treated as specific property subject to being converted when it is 'identified as a specific thing.'"  Id. (quoting Baxter v. King, 81 Cal. App. 192, 194 (1927)).

21

United States District Court
For the Northern District of California

The parties do not brief the issue but, in any event, Octagon's counterclaims for conversion fail.  Hendrickson and LaBoy did not pocket money Octagon had given them to give to someone else or, say, make off with duffel bags full of Octagon's cash, see, e.g., id. at 397 ("Plaintiffs alleged a conversion of 10 duffel bags, each containing $500,000."). The agents owe Octagon plenty of money – just not under a conversion theory.

### G.     Money Had and Received Counterclaims

A claim for money had and received may be brought "wherever one person has received money which belongs to another and which in equity and good conscience . . . should be returned." Mains v. City Title Ins. Co., 34 Cal. 2d 580, 586 (1949).  It applies to "money paid by mistake, money paid pursuant to a void contract, or" – as relevant here – "a performance by one party of an express contract." Utility Audit Co., Inc. v. City of Los Angeles, 112 Cal. App. 4th 950, 958 (2003).  In short, it is a claim for restitution. See 4 Witkin, Cal. Proc. 5th Plead § 561 (2008).  Octagon may seek this remedy.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part all motions for declaratory and injunctive relief.  As to the remaining claims and counterclaims in Hendrickson (case no. 14-1416), the Court:

- DENIES Hendrickson's motion on his sixth claim for Unfair Business Practices because, although the agreement contained partially unlawful provisions, he has not proved the existence of any damages.

- DENIES Hendrickson's motion on his first claim for Restraint on Trade because, although the agreement contained partially unlawful provisions, he has not proved the existence of any damages.

- GRANTS in part and DENIES in part Hendrickson's motion on Octagon's second counterclaim for breach of contract.

- GRANTS Hendrickson's motion on Octagon's third counterclaim for intentional interference with a contract.

- GRANTS Hendrickson's motion on Octagon's fourth counterclaim for interference with prospective economic advantage.

- GRANTS Hendrickson's motion on Octagon's fifth counterclaim for conversion.

- GRANTS in part and DENIES in part Hendrickson's motion on Octagon's sixth counterclaim for money had and received.

United States District Court
For the Northern District of California

- GRANTS in part and DENIES in part Hendrickson's motion on Octagon's seventh counterclaim for Unfair Competition.

- GRANTS in part and DENIES in part Octagon's motion on its second counterclaim for breach of contract against Hendrickson.

- DENIES Octagon's motion on its third counterclaim for intentional interference with a contract against Hendrickson but GRANTS in part and DENIES in part Octagon's motion on this counterclaim against Relativity.

- DENIES Octagon's motion on its fourth counterclaim for intentional interference with prospective economic advantage against Hendrickson and Relativity.

As to the remaining claims and counterclaims in LaBoy (case no. 14-1417), the Court:

- DENIES LaBoy's motion on his seventh claim for Unfair Business Practices because, although the agreement contained partially unlawful provisions, he has not proved the existence of any damages.

- DENIES LaBoy's motion on his first claim for Restraint on Trade because, although, the agreement contained partially unlawful provisions, he has not proved the existence of any damages.

- GRANTS in part and DENIES in part LaBoy's motion on Octagon's second counterclaim for breach of contract.

- GRANTS LaBoy's motion on Octagon's third counterclaim for intentional interference with a contract.

- GRANTS LaBoy's motion on Octagon's fourth counterclaim for interference with prospective economic advantage.

- GRANTS LaBoy's motion on Octagon's fifth counterclaim for conversion.

- GRANTS in part and DENIES in part LaBoy's motion on Octagon's sixth counterclaim for money had and received.

- GRANTS in part and DENIES in part LaBoy's motion on Octagon's seventh counterclaim for Unfair Competition.

- GRANTS in part and DENIES in part Octagon's motion on its second counterclaim for breach of contract against LaBoy.

- DENIES Octagon's motion on its third counterclaim for intentional interference with a contract against LaBoy but GRANTS in part and DENIES in part Octagon's motion on this counterclaim against Relativity.

- DENIES Octagon's motion on its fourth counterclaim for intentional interference with prospective economic advantage against Hendrickson and Relativity.

**IT IS SO ORDERED.**

Dated: December 2, 2016

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE